IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 11, 2013 Session

# BRANDON W. MARTIN AND AMY MARTIN v. W. B. MELTON AND PEGGY MELTON

**Appeal from the Circuit Court for Overton County**
**No. 4326H      John D. Wootten, Jr., Judge**

---

**No. M2012-01500-COA-R3-CV - Filed November 26, 2013**

---

An apprentice lineman agreed to help a neighbor by climbing a utility pole on the neighbor's land and disconnecting an electrical wire at the top. After he disconnected the wire, the pole fell over, causing the lineman himself to fall and to suffer severe injuries. He filed a negligence complaint, alleging that the neighbor had not set the pole deeply enough into the ground, thereby rendering it unreasonably dangerous. The trial court granted summary judgment to the defendant, holding that because of the plaintiff's expertise in electrical matters, it was his duty alone to make sure the pole was safe before climbing it. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Michael S. Pemberton, Knoxville, Tennessee, for the appellants, Brandon W. Martin and Amy Martin.

Daniel H. Rader, III, Walter S. Fitzpatrick, III, Cookeville, Tennessee, for the appellees, W. B. Melton and Peggy Melton.

## OPINION

### I. AN UNFORTUNATE ACCIDENT

W.B. Melton owns a farm in Overton County, Tennessee. He set a utility pole on his property in l983 or 1984 using a three and a half foot long augur to dig the hole into which he set the pole, and he ran an electrical line from the pole to his barn. In October of 2008, Mr. Melton began building a new barn on his property. He did some excavation to prepare

the site for the new construction, which included removing some of the dirt that supported the utility pole.

Mr. Melton decided to remove the pole, and he asked a neighbor, plaintiff Brandon Martin, to help him by disconnecting the electrical wire from the top. Mr. Martin was a second year apprentice lineman who worked for the Upper Cumberland Electrical Membership Cooperative (UCEMC). Mr. Melton presumed that he had the necessary expertise to safely disconnect the electrical wire. Mr. Martin agreed to help as a favor for his neighbor.

On October 10, 2008, Mr. Martin came over to Mr. Melton's property to disconnect the wire. Mr. Melton offered to lift Mr. Martin to the top of the pole in a bucket on his tractor, but Mr. Martin felt that it would be safer from him to climb the pole. Mr. Martin checked the pole for soundness and stability as he had been trained to do and then climbed it. He successfully removed the line as requested, but the pole became unstable immediately afterwards and fell over, causing Mr. Martin to fall as well and to suffer serious bodily injuries. His injuries did not result from electric current, but only from the fall itself.

## II. LEGAL PROCEEDINGS

On October 1, 2009, Mr. Martin filed a negligence complaint in the Circuit Court of Overton County naming both Mr. Melton and his wife as defendants.[1] He contended that the pole was dangerous because it was installed at an insufficient depth, and that the Meltons breached their duty of due care by failing to warn him about the dangerous condition. The Meltons answered, asserting that Mr. Martin's accident was the result of his own failure to make certain that the pole was safe to climb and denying that they violated any legal duty to him. In the alternative, they invoked the affirmative defense of comparative fault, contending that if they violated any duty they had towards Mr. Martin, his fault equaled or exceeded their own, thereby barring any recovery. *See McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992).

Mr. Martin and Mr. Melton both gave depositions. Mr. Martin's deposition included testimony as to how he inspected the pole before climbing it. He stated that after checking the area around the pole to make sure it was clear, he took the pliers out of his belt, "and I pecked all around it, went all the way around it to make sure it wasn't rotten, the pole was

---

[1]Mr. Martin subsequently acknowledged that Mrs. Melton had no involvement in the events giving rise to his injuries.

solid, it was sound." After that he looked for the birthmark,[2] but didn't see one. He then tried to shake or rock the pole, but couldn't budge it. As he started up the pole, he shook again to see if it was sturdy, and he observed that it wasn't loose and that it didn't shake. So he climbed to the top and put his safety belt around the pole, with the results described above.

On August 24, 2011, the defendants filed a motion for summary judgment. In their motion and a supporting brief, they argued that because of Mr. Martin's expertise, it was his duty to make certain that the pole was safe and that the line could be removed safely. An affidavit by Stevenson Nunley, an experienced lineman, was attached to their motion. He testified that after reviewing the depositions, he had reached an opinion "within a reasonable degree of certainty," that Mr. Martin had failed to follow the basic requirements to determine the depth of the pole before he climbed. An affidavit by Randy Joe Weeks, a journeyman lineman with twenty-six years of experience, also recited that Mr. Martin had not followed the basic safety requirements of the industry.

Mr. Martin filed a response to the motion for summary judgment, pointing to the widely accepted legal proposition that an owner or occupier of land owes a duty to exercise reasonable care to make the premises safe for those lawfully on the premises. He attached three affidavits to his response. One was by Dennie Chilton, a veteran lineman with thirty-seven years of experience, and like Mr. Martin, an employee of UCEMC. Mr. Chilton testified that on October 10, 2008, he received a telephone call advising him that a utility pole had fallen and that Mr. Martin had been injured. He rushed to the scene, where he assisted Mr. Martin and the ambulance crew that had been called to the property.

After the ambulance left, he observed that the fallen pole was between 25 and 30 feet long. He also observed, from the dirt and the stains on the pole and the depth of the hole where the pole had been set, that only eighteen to twenty-four inches of its length had been in the ground. He stated that the proper depth for a utility pole is a minimum of one foot for each ten feet of length of the pole, plus an additional two feet. Therefore, a twenty five foot pole should be set and maintained in the ground at a minimum depth of four and a half feet, and a thirty foot pole should be set and maintained in the ground at a minimum depth of five feet. Mr. Chilton testified that it is the responsibility of the person setting the pole to set it properly and maintain its depth. He also testified on the basis of Mr. Martin's deposition that Mr. Martin had complied with the appropriate procedures for checking the safety of the pole and that he was not negligent in the way he inspected and climbed it.

_____

[2]The "birthmark" of a pole is apparently an identifying object fastened to the pole at or below waist level, and containing information about its age and its depth.

Justin Craig Cagle, a lineman who teaches safety classes on pole climbing, also testified by affidavit after reading Mr. Martin's deposition. He stated that Mr. Martin "did exactly what he should have done prior to climbing the pole," and that other than taking those steps, "there is very little that a lineman can do to ascertain the safety of the pole to be climbed." W.C. Vaughn, a neighbor of the Meltons and Mr. Martin, testified by affidavit as well. He stated that he went to the scene of the accident on October 10, 2008, and having observed the pole and the hole in which it had been placed, concluded that it had been approximately eighteen inches in the ground at the time it fell.

On May 14, 2012, the trial court conducted a hearing on the motion for summary judgment. Following the arguments of the parties, it ruled from the bench and granted the motion. Its decision was memorialized in an order filed on June 13, 2012. The court reasoned that the dispositive issue in the case was one of duty. Among the court's factual findings was that "dealing with electricity is an ultrahazardous activity," and because he was a lineman, Mr. Martin was an expert.[3]

The court relied on those findings to conclude that because Mr. Martin chose the means and method to operate, he assumed the risk of injury, and he alone had the duty of ensuring his own safety. The court declared that "despite the affidavits stating that Plaintiff Brandon Martin performed correctly, it is the court's opinion that he did not." The court also stated that the affidavits did not create a genuine issue of material fact in the case and that the defendants were accordingly entitled to summary judgment. This appeal followed.

### III. SUMMARY JUDGMENT

The requirements for a grant of summary judgment are well known. Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn R. Civ. P. 56.04. *See also*, *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

---

[3]Our Tennessee courts have several times made note of the inherent dangerousness of electricity. *See Bennett v. Trevecca Nazarene University*, 216 S.W.3d 293, 299 (Tenn. 2007); *Wilson v. Electric Power Board of Chattanooga,* 544 S.W.2d 92, 96 (Tenn. 1976). They have also classified certain activities as "ultrahazardous" for the purposes of strict liability, including "the carrying out of blasting operations, the storing of explosives or harmful chemicals, and the harboring of wild animals." *Concklin v. Holland*, 138 S.W.3d 215, 223 (Tenn. Ct. App. 2003) (quoting *Leatherwood v. Wadley,* 121 S.W.3d 682, 699 (Tenn. Ct. App. 2003)). However, we have been unable to find any prior Tennessee case in which our courts have characterized dealing with electricity as an "ultrahazardous activity."

When considering a summary judgment motion, the trial court must view the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in the non-moving party's favor, and discard all countervailing evidence. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d at 210–11. Accordingly, the court is not to "weigh" the evidence when evaluating a motion for summary judgment, or substitute its judgment for that of the trier of fact. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d at 87; *Byrd v. Hall*, 847 S.W.2d at 211.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d at 84; *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall*, 130 S.W.3d at 763.

In our review, we must also consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all the reasonable inferences to be drawn from that evidence. *Green v. Green,* 293 S.W.3d 493, 514 (Tenn. 2009); *Doe v. HCA Health Services, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

## IV. DUTY

As we have frequently observed, a negligence claim requires a plaintiff to prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *Rice v. Sabir,* 979 S.W.2d 305 (Tenn. 1998); *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995). The trial court's order in this case was based on its understanding of the first of those elements. The court reasoned that because of Mr. Martin's expertise and the choices he made, Mr. Melton did not own him any particular duty of care. We do not agree.

The existence or non-existence of a duty owed to the plaintiff by the defendant has long been held to be a question of law to be determined by the courts. *Blair v. Campbell,* 924 S.W.2d 75, 78 (Tenn. 1996) (citing *Carson v. Headrick*, 900 S.W.2d 685, 690 (Tenn. 1995)); *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993); *Dill v. Gamble Asphalt Materials,* 594 S.W.2d 719, 721 (Tenn. Ct. App. 1979). Tennessee courts have interpreted the element of duty to include a factual element.

"In analyzing duty, the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm." *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 902 (Tenn. 1996). *See also*, *Coln v. City of Savannah,* 966 S.W.2d 34 (Tenn. 1998). Thus, although the court is to treat the question of duty as a matter of law, when determining that question at the summary judgment stage, it must view the evidence of foreseeability, risk and burden in the light most favorable to the non-moving party.

Two rules regarding duty apply to this case. First, an individual has a duty to take reasonable care for his or her own safety. *O'Brien v. Smith Bros. Engine Rebuilders, Inc.*, 494 S.W.2d 787, 791 (Tenn. Ct. App. 1973); *Johnson v. Dupree Oil Co., Inc.*, E2004-01433-COA-R3-CV, 2005 WL 1981799 (Tenn. Ct. App. Aug. 16, 2005) (no Tenn. R. App. P. 11 application filed); *Cook v. Wilson,* 86-132-II, 1987 WL 7333 (Tenn. Ct. App. Mar. 6, 1987). Second, a property owner has a duty to exercise reasonable care to make his property safe for those lawfully on the premises and to protect them from unreasonable risks of harm. *Rice v. Sabir*, 979 S.W.2d at 308; *Bowman v. State*, 206 S.W.3d 467, 473 (Tenn. Ct. App. 2006).

"The duty of the invitee and the owner are identical. Each is under a duty to exercise reasonable care. The former must exercise reasonable care for his own safety and the latter must exercise reasonable care for the safety of the other." *O'Brien v. Smith Bros. Engine Rebuilders, Inc.*, 494 S.W.2d at 791.

The property owner has a duty to warn guests on his land of latent or hidden dangers that the owner knows of or should be aware of. That duty is based upon the assumption that the owner has superior knowledge of a perilous condition on his own premises that a visitor does not possess. *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 299 (Tenn. 2007); *Eaton v. McLain,* 891 S.W.2d 587, 595 (Tenn. 1994); *Dobson v. State*, 23 S.W.3d 324, 330 (Tenn. Ct. App. 1999).

Mr. Melton relies on three cases that discuss an exception to the general proposition that a landowner owes a duty to use reasonable care to make his property safe or to warn of latent or hidden dangers. The exception applies to contractors injured while working on something they were hired to repair. In *Shell Oil Company v. Blanks*, 330 S.W.2d 569 (Tenn. 1959), the Tennessee Supreme Court noted that an owner or occupier of land is generally obligated to use reasonable care to provide a safe place in which an independent contractor or his employees can work, but where the risks that led to an injury are intimately connected with the defects which the contractor has undertaken to repair, the duty may not apply.

The court reasoned that in such cases, the contract of repair "is sufficient in itself to impart notice of a defect, the extent of which the repairman must discover for himself." *Shell Oil v. Blanks*, 330 S.W.2d at 571. In the *Blanks* case, a painter fell when a steel pole he was painting gave way. The pole had long been defective, and wire had been wrapped around the pole to keep it from tipping over. The Court held that since the plaintiff had been hired to only paint the pole, not to repair it, he had no reason to be aware of the structural defect that caused his injury.

In *Blair v. Campbell,* 924 S.W.2d 75 (Tenn. 1996), the court cited the rule enunciated in *Shell Oil v. Blanks* and applied it to affirm a summary judgment for the defendant landowner. The plaintiff in that case was a contractor who had been retained to repair the roof over a porch on a rental duplex. The plaintiff was injured when the wood holding the gutter in place gave way. The Supreme Court held, "[a]lthough a premises owner generally owes a contractor the duty to provide a reasonably safe workplace, we conclude that this duty does not apply when the contractor is injured while making the specific repairs called for in the contract." *Blair v. Campbell,* 924 S.W.2d at 75-6. *See also Rice v. Sabir,* 979 S.W.2d at 310.

Finally, in *Crain v. Baptist Memorial Hospital*, W2004-00477-COA-R3-CV, 2005 WL 1996635 (Tenn. Ct. App. Aug. 18, 2005) (Rule 11 perm. app. denied Jan. 30, 2006) an electrical contractor entered into a contract with Baptist Hospital that required a high-voltage electrical receptacle to be moved from one location to another. An employee of the contractor was severely injured when he misunderstood the instructions of his supervisor and touched a wire to the powered side of a box.

The employee sued the hospital for negligently failing to warn him against dangerous conditions in the workplace. This court affirmed the trial court's grant of summary judgment to the hospital. Citing both *Shell Oil v. Blanks* and *Blair v. Campbell*, we stated that "[w]hile there is a general duty of a landowner to provide a reasonably safe work environment for an independent contractor, there is an exception to this rule when the contractor is hired to perform inherently dangerous work. The contractor in such circumstances is on notice of the danger inherent to the job and 'the owner is under no duty to provide a reasonably safe workplace to the contractor.'" *Crain v. Baptist Memorial Hospital*, 2005 WL 1996635 at *2 (quoting *Blair v. Campbell,* 924 S.W.2d at 77).

Mr. Melton relies on *Crain*, arguing that because Mr. Martin agreed to move a power line, he was on notice of the danger inherent to the job. We think that reliance is misplaced. First, Mr. Martin was not hired repair anything, so no notice of defect existed. He cannot be charged with the knowledge underlying the contractor exception. Further, the broad language in *Crain* that we quoted above refers to the inherent danger in working with

-7-

electricity. The idea that electricity is inherently dangerous is well known, and specialized knowledge is required to safely deal with it. An electrical worker has greater knowledge than the landowner regarding how to make his or her workplace safe.

However, in the case before us, Mr. Martin's injury had nothing to do with the power line or with electricity. The proof showed that Mr. Martin's injury occurred because the utility pole installed by Mr. Melton fell. Even if the pole had not had a power line attached, Mr. Martin would have fallen and been injured.

The cases relied upon by the landowner demonstrate that a key element in establishing the contractor exception to landowner duty is the degree of awareness of the hidden or latent hazard possessed respectively by the plaintiff and by the defendant property owner. They do not justify the grant of summary judgment in this case.

It was Mr. Martin's burden to establish that Mr. Melton owed him a duty to either make sure his premises were safe for Mr. Martin to do the work he was asked to do or to warn him of any hidden dangers. Proof was presented that Mr. Melton had actual knowledge of how deeply the pole was set, because he installed it himself. Mr. Melton also acknowledged that the pole had extended no more than three and a half feet beneath the surface, because that was the length of the augur he used to dig the hole into which the pole was originally set. Mr. Melton also removed some of the earth around the pole while preparing the ground for the new construction.

Consequently, Mr. Martin established the element of duty on the part of the defendant that is necessary to a tort claim. In ruling on the defendants' motion for summary judgment, the trial court did not discuss whether Mr. Martin had established a duty. Instead, it held that Mr. Martin was the one that had the duty in this case, not the defendants. That holding was apparently based upon the contractor exception discussed above, because the court found that dealing with electricity is an ultrahazardous activity; that Mr. Martin had been obligated to follow the procedures set out in the safety manual that was introduced; and that Mr. Martin acknowledged he was to follow those procedures and to choose the means and method for the work, thereby assuming the risk.

We do not agree that undisputed facts established that the contractor exception applied to relieve the landowner from any duty. Two experienced linemen testified by affidavit that Mr. Martin did exactly what he was trained to do to ascertain the stability of the pole before he climbed it. However, they also stated that those methods were not sufficient to reveal how deeply into the ground the pole had been set and that such an inspection does not guarantee safety.

The court stated that "despite the affidavits stating that Plaintiff Brandon Martin performed correctly, it is the court's opinion that he did not." The basis for this statement is not clear, but, at the stage of summary judgment, the affidavits must be considered in the light most favorable to non-moving party and countervailing evidence would merely create a dispute of fact.

Mr. Martin established that Mr. Melton owed him a duty, and there are disputed facts concerning whether the exception applies. Mr. Martin also had a duty to protect himself. Because of the importance of prior knowledge, actual or constructive, in analyzing the relative duties in this situation, and the varying evidence relevant to this issue, we conclude that the grant of summary judgment should be reversed.

## V.

The judgment of the trial court is reversed. We remand this case to the Circuit Court of Overton County for any further proceedings necessary. Tax the costs on appeal to the appellees.

_____
PATRICIA J. COTTRELL, JUDGE